MICHELE THOMPSON *v.* MICHAEL THOMPSON

[No. 1216, September Term, 1977.]

*Decided September 6, 1978.*

The cause was argued before MORTON, MOORE and COUCH, JJ.

*Samuel Paavola* and *John C. Eidleman* for appellant.

*George J. Chartrand,* with whom were *Legum, Cochran & Chartrand, P.A.* on the brief, for appellee.

MORTON, J., delivered the opinion of the Court.

In this appeal it is contended that the two year statute of limitations provision to establish the paternity of a child, contained in Maryland Code, art. 16, § 66 (e), violates the equal protection and due process clauses of the fourteenth

amendment to the Constitution of the United States. Since we find that this provision is not violative of those constitutional clauses, we shall affirm the holding of the Circuit Court for Anne Arundel County that appellant's paternity suit against appellee is barred by limitation.

The record indicates that on May 10, 1969, Veronica Mason gave birth to Michele Thompson. Ms. Mason took no legal action to establish the paternity of her illegitimate child or to obtain support for the child from the putative father, Michael Thompson, appellee, until December 1, 1971, when she filed a paternity petition on behalf of her daughter in the Circuit Court for Anne Arundel County. Appellee did not file an answer to the petition until August 29, 1977,[1] when he alleged that the action was barred by the two year statute of limitations set forth in Maryland Code, art. 16, § 66 (e). Separate counsel was appointed by the court on October 11, 1977, to represent the infant, Michele Thompson, who is the appellant in this appeal. The matter was thereafter heard by Judge E. Mackall Childs who, on October 13, 1977, held that the paternity action was barred by the applicable statute of limitations.

Section 66 (e) reads in full:

"(e) Proceedings to establish paternity under the subtitle 'Paternity Proceedings' and to charge the putative father of an illegitimate child or children with their support and maintenance shall be commenced during the pregnancy of the mother thereof or within two (2) years after the birth of such child or children; except that if the putative father of such child or children has acknowledged in writing the paternity of the child or children or has made payment or otherwise provided for the support and maintenance of the child or children, it is sufficient if the proceedings are commenced within two (2) years of the date of such acknowledgement or the last such payment or provision; provided, that the

---

1. A blood test was given to the parties on June 22, 1976, which indicated that appellee could not be excluded as the father of Michele.

> institution of proceedings under the former Article 12 of this Code, title 'Bastardy and Fornication,' prior to June 1, 1963, shall suspend the further running of the period of limitations provided for herein."

Appellant does not contest the fact that she failed to abide by the requirements of § 66 (e). Rather, she contends that § 66 (e) is unconstitutional for several reasons: (1) It requires illegitimate children, such as appellant, to commence a paternity action within two years of their birth thereby "denying ... [them] fundamental rights enjoyed by other children ...," in violation of their right to equal protection under the law. as embodied in the fourteenth amendment to the United States Constitution. (2) It "is an overly restrictive means of achieving a state goal of preventing fraudulent claims ...," in contravention of the equal protection and due process clauses of the fourteenth amendment. (3) It "forecloses the right of an illegitimate child to establish her paternity unless action is commenced within two years of her birth thus allowing another individual to waive the child's fundamental right, and thus raising an irrebuttable presumption that her claim is fraudulent or stale, and thus refusing her notice or an opportunity to be heard ... in violation of the Due Process Clause of the Fourteenth Amendment...." [2]

Addressing appellant's first contention, that § 66 (e) violated her right to equal protection by requiring her to commence paternity and support actions within two years of

---

[2]

"[AMENDMENT XIV]

Section 1.

[Citizenship Rights Not to Be Abridged by States]
All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

birth, which is not required of legitimate children, we observe that the Supreme Court, through a series of cases over the last ten years, has slowly departed from the traditional two-tier equal protection analysis where the alleged constitutional infringement concerns illegitimate children. The initial cases, *Levy v. Louisiana,* 391 U. S. 68 (1968), and *Glona v. American Guarantee & Liability Insurance Co.,* 391 U. S. 73 (1968), serve as little, if any, precedential value since the Court concluded that the statutes there contested could not be justified regardless of what standard — strict scrutiny, rational basis or otherwise — was utilized in assessing their constitutional viability. The Court merely asserted the obvious "premise that illegitimate children are not 'nonpersons' "; that "[t]hey are humans, live, and have their being"; that "[t]hey are clearly 'persons' within the meaning of the Equal Protection Clause of the Fourteenth Amendment", and, accordingly, are entitled to at least minimal protection thereunder. *Levy v. Louisiana, supra,* at 70.

Beginning with *Weber v. Aetna Casualty & Surety Co.,* 406 U. S. 164 (1972), a third standard of analysis, inferable but not specifically articulated therein, began to evolve when the statutory classification under attack would deprive illegitimate children of rights otherwise accorded legitimate children. This standard, which falls somewhere between the traditional strict scrutiny and rational basis tests, was expressed at page 173 of the opinion, as follows:

"The essential inquiry in all the foregoing cases is, however, inevitably a dual one: What legitimate state interest does the classification promote? What fundamental personal rights might the classification endanger?"

The Court recently had occasion to reiterate this middle standard of constitutional evaluation in *Trimble v. Gordon,* 430 U. S. 762, 767 (1977), when it declared:

"Appellants urge us to hold that classifications based on illegitimacy are 'suspect,' so that any justifications must survive 'strict scrutiny.' We

considered and rejected a similar argument last Term in *Mathews v. Lucas,* 427 U. S. 495, 96 S.Ct. 2755, 49 L.Ed.2d 751 (1976). * * * Despite the conclusion that classifications based on illegitimacy fall in a 'realm of less than strictest scrutiny,' *Lucas* also establishes that the scrutiny 'is not a toothless one,' *id.,* at 510, 96 S.Ct. at 2764, a proposition clearly demonstrated by our previous decisions in this area."

Appellant asserts that under the principles enunciated in *Weber, Mathews* and *Trimble,* § 66 (e) does not effectively promote a legitimate state interest. She contends that "[t]hough the state does have an interest in encouraging the prompt and orderly resolution of litigation, a limitation cannot be applied wholesale with the effect of totally excluding an entire class of claims."

We cannot subscribe to appellant's position. Statutes of limitations, although they may arbitrarily deprive some otherwise rightful claimants of access to the courts, have long been recognized as a valid exercise of a state's right to regulate the functioning of its judicial system. They are "designed primarily to assure fairness to defendants on the theory that claims, asserted after evidence is gone, memories have faded, and witnesses disappeared, are so stale as to be unjust." *Bertonazzi v. Hillman, Adm'x,* 241 Md. 361, 367 (1966).

Indeed, the Supreme Court recognized in *Weber, supra,* at 174, that "arbitrary lines" may be drawn by the states to "facilitate potentially difficult problems of proof." Moreover, in *Gomez v. Perez,* 409 U. S. 535, 538 (1973), the Court "recognize[d] the lurking problems with respect to proof of paternity." The Court added the caveat that "[t]hose problems·are not to be lightly brushed aside, but neither can they be made into an impenetrable barrier that works to shield otherwise invidious discrimination." *Id.*

That the General Assembly of Maryland did not purposefully seek to discriminate against illegitimate children becomes self-evident when the limitations provision

of § 66 (e) is read in conjunction with the declaration in § 66A: "The General Assembly declares its conviction that the State has a duty to ameliorate the deprived social and economic status of children born out of wedlock and that the policies and procedures as contained in this subtitle and in § 66 of this article relative to establishing the paternity of such children, determining who shall have their custody or guardianship and who shall be charged with their maintenance and support are socially necessary and desirable, having as their threefold purpose (1) the promotion of the general welfare and best interests of such children by securing to them, as near as practical, the same right to support, care and education as legitimate children; (2) the imposition upon both parents of such children the basic obligations and responsibilities of parenthood and (3) the simplification of procedures."

We believe that § 66 (e) was enacted by the legislature in a sincere endeavor to avoid the pitfalls inherent in establishing paternity and to facilitate the resolution of the difficult problems of proof in paternity cases. We see no distinction in this regard between § 66 (e) and the various statutes of limitations covering other areas of substantive law.[3]

In *State v. Rawlings,* 38 Md. App. 479 (1978), this Court specifically addressed and affirmed the raison d'etre of a statute of limitations with regard to the institution of a paternity action. At pages 484-85, we said:

"[T]he determination of the paternity of illegitimate children presents special problems. Although the situation has improved, proof of paternity remains an inexact science. *See* Shaw and Kass, *Illegitimacy, Child Support, and Paternity Testing,* 13 Houston L. Rev. 41, 47 (1975). Once an individual is accused of

---

3. *See, e.g.,* Com. Law Art. § 2-725, breach of contract (four years); Com. Law Art. § 11-207, prosecution for violation of Maryland Antitrust Act (three years); Cts. & Jud. Proc. Art. § 5-101, general tort limitation (three years); Cts. & Jud. Pro. Art. § 5-102, specialties (twelve years); Cts. & Jud. Pro. Art. § 5-103, adverse possession (twenty years); Cts. & Jud. Pro. Art. § 5-105, assault, battery, libel and slander (one year); Cts. & Jud. Pro. Art. § 5-106, prosecution of misdemeanor (one year).

being the father of the child he may have a difficult time rebutting the charge. The legislature recognized the problem and after weighing the various interests involved provided for uniform procedures for determining disputed paternity coupled with a set statute of limitations to protect the rights of the alleged father. The State admitted below it was trying to circumvent these procedures to avoid being confronted with the two year limitation provision contained in Art. 16, § 66 (e). This we cannot allow because while it is reasonable to remove the effect of two year limitations when there has been a clear confession of paternity, to do so otherwise is to put an alleged father in an impossible position." (Footnote omitted.)

We decline, here, to recede from the foregoing analysis and, accordingly, conclude that § 66 (e) does, indeed, promote a legitimate state interest.

Under the second prong of the *Weber, Mathews, Trimble* analysis, we must examine what, if any, fundamental personal rights might be endangered by the two year limitation provision of § 66 (e). Appellant argues that § 66 (e) will deprive her of several " 'fundamental' and 'sensitive' personal rights of the type the court sought to protect in *Weber,"* to wit, the right to paternal support, the right to establish the identity of her father and the right to inheritance. Again we must disagree with appellant's contention.

In *San Antonio School District v. Rodriguez,* 411 U, S. 1 (1973), the petitioners attacked the Texas system of financing public education on the premise that it denied them equal protection under the law. They asserted that the right to education is fundamental and therefore guaranteed by the United States Constitution. The Supreme Court, speaking through Mr. Justice Powell, however, rejected this proposition. At pages 33-35 of the opinion, the Court stated:

"It is not the province of this Court to create substantive constitutional rights in the name of

guaranteeing equal protection of the laws. Thus, the key to discovering whether education is 'fundamental' is not to be found in comparisons of the relative societal significance of education as opposed to subsistence or housing. Nor is it to be found by weighing whether education is as important as the right to travel. Rather, the answer lies in assessing whether there is a right to education explicitly or implicitly guaranteed by the Constitution. * * * *

Education, of course, is not among the rights afforded explicit protection under our Federal Constitution. Nor do we find any basis for saying it is implicitly so protected. As we have said, the undisputed importance of education will not alone cause this Court to depart from the usual standard for reviewing a State's social and economic legislation."

In *Dandridge v. Williams,* 397 U. S. 471, 485 (1970), the Court, while explicitly recognizing that the "administration of public welfare assistance ... involves the most basic economic needs of impoverished human beings," nonetheless concluded that the importance of welfare benefits to the poor did not create a fundamental right, in the constitutional sense, and therefore did not require the state to justify its statute by showing some compelling state interest.

Similarly, in *Lindsey v. Normet,* 405 U. S. 56 (1972), the Court refused to hold that the constitution guaranteed the right to adequate housing. "We do not denigrate the importance of decent, safe, and sanitary housing. But the Constitution does not provide judicial remedies for every social and economic ill. We are unable to perceive in that document any constitutional guarantee of access to dwellings of a particular quality, or any recognition of the right of a tenant to occupy the real property of his landlord beyond the term of his lease without the payment of rent or otherwise contrary to the terms of the relevant agreement. Absent constitutional mandate, the assurance of adequate housing and the definition of landlord-tenant relationships are legislative, not judicial, functions." 405 U. S. at 74.

Additionally, we look to the holding of the Supreme Court in *Labine v. Vincent,* 401 U. S. 532 (1971), that the right to regulate intestate succession is a matter left to the discretion of the states and, concomitantly, refused to find that the right of an illegitimate child to receive property through intestate succession is a fundamental right guaranteed by the United States Constitution.[4]

In light of the foregoing decisions of the Supreme Court, we have no compunction in concluding that appellant was not deprived of any constitutional fundamental right by virtue of § 66 (e). While it may be that § 66 (e) will result in a deprivation of appellant's right to paternal support, to inheritance and to establish the identity of her father, these are not rights explicitly or implicitly guaranteed by the constitution. *See, e.g., Griswold v. Connecticut,* 381 U. S. 479 (1965).

Since we conclude that the limitation provision of § 66 (e) promotes a legitimate state interest and, at the same time, does not invade any fundamental personal rights of appellant, in a constitutional sense, we have no hesitancy in concluding that appellant was not denied equal protection by the statutory requirement that paternity and support actions must be commenced within two years of birth. *Accord, State ex rel Krupke v. Witkowski,* 256 N.W.2d 216 (Iowa 1977); *Cessna v. Montgomery,* 63 Ill. 2d 71, 344 N.E.2d 447 (1976).

We turn next to the contention that § 66 (e) is violative of both the equal protection and due process clauses of the fourteenth amendment because "less restrictive means are available for achieving the state goal" of preventing fraudulent and stale claims. When such is the case, argues appellant, the state is constitutionally mandated to pursue the less restrictive alternative. *See Shelton v. Tucker,* 364 U. S. 479 (1960). Appellant proffers, as a less restrictive alternative, that "[t]he use of improved blood testing techniques coupled with traditional burden of proof will satisfy the purposes the state advances by imposing the

---

4. *But see, e.g.,* Shapiro v. Thompson, 394 U. S. 618 (1969), where the Court noted that the right to travel freely among the states is implicitly guaranteed by the constitution.

statute of limitations" and, at the same time, avoid the "artificial" preclusion of some valid cases.

Specifically, appellant argues that a falsely accused man will be excluded by modern testing methods in approximately 93 to 99 percent of paternity cases and, concomitantly, "that a man not excluded after extensive testing is overwhelmingly likely to be the father of the child in question." *See* Shaw and Kass, *Illegitimacy, Child Support, and Paternity Testing,* 13 Houston L. Rev. 41 (1975); *Joint AMA-ABA Guidelines: Present Status of Serologic Testing,* Vol. X, Family Law Quarterly, 247 (1976); Schacter, Hsu & Bias, *HLA and Other Genetic Markers in Disputed Paternity: A Report of 50 Cases,* Vol. IX, Supp. 1, Transplantation Proceedings 233 (1977), from the Division of Medical Genetics, The Johns Hopkins University, Baltimore, Maryland.

We have carefully reviewed the scientific data and conclusions reached in the studies submitted by appellant and agree that medical technology is, indeed, making progress in the science· of blood testing. Perhaps our technology will eventually devise a virtually perfect test for determining one's paternity. We are not convinced, however, that day is at hand. *State v. Rawlings, supra,* at 484. Until it arrives, we do not feel that we are constitutionally required, under the less restrictive means theory, to strike down the statute of limitations provision in § 66 (e). There are simply still too many uncertainties in the available blood testing techniques for us to override judicially the mandate of the legislature. Rather, we believe that the adoption of blood testing in the stead of a fixed statute of limitations is a matter presently to remain in the wisdom of the legislature.

Finally, we find no merit in appellant's contention that the two year statute of limitations violates her right to due process under the fourteenth amendment because it allows her right to paternal support to terminate before she has any real opportunity to assert it. Appellant posits that permitting a child's mother to institute paternity proceedings in behalf of her offspring does not thereby satisfy the requirements of due process because the mother's short term interests, *viz.,* continuing fondness for the father or her reluctance publicly

to reveal her indiscretion, may conflict with the child's long term interests of support and the establishment of paternity. There is no denying that this possibility exists. In our opinion, however, the Maryland General Assembly could reasonably conclude that the decision whether to institute a paternity action is in the child's best interest, in contrast to the mother's, vests with the mother. Certainly, we feel that it is reasonable for the legislature to conclude that this policy decision, when coupled with the state's legitimate interest in preventing stale or fraudulent claims, on balance, outweighs the potential harm to illegitimate children who may have their right to paternal support forfeited by the mother's inaction. We also observe that the failure to bring a paternity suit within two years forecloses only the right to support from the alleged natural father. The child, however, will not be left without a means of support. The natural mother is still bound, under fear of criminal prosecution, to support her child, Maryland Code, art. 27, § 88 (b) (1), and, if necessary, the child will be eligible to receive support from public funds. Accordingly, we hold that the two year statute of limitations provided in § 66 (e) does not violate the due process clause of the fourteenth amendment to the United States Constitution.[5]

*Judgment affirmed; costs to be paid by appellant.*

5. In affirming the constitutionality of § 66 (e) we hold only that we find no infirmity in that portion of the statute which requires one to commence an action within two years of birth to establish paternity. We express no opinion as to the constitutionality of the latter portion of the statute which requires one to commence an action for support within two years of an acknowledgment of paternity, if applicable, or the date of the last support payment, since in this case the crux of the matter was the question *vel non* of paternity itself and no prior support payments have been made.