## MICHELLE I. THOMPSON *v.* MICHAEL THOMPSON

[No. 85, September Term, 1978.]

*Decided July 20, 1979.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, ORTH and COLE, JJ.

*Samuel Hansel Paavola* for appellant.

*Martha Wyatt* and *George J. Chartrand,* with whom were *Legum, Cochran, Chartrand & Wyatt, P.A.* on the brief, for appellee.

SMITH, J., delivered the opinion of the Court.

In this case a minor child asks that we strike down as unconstitutional that portion of Maryland Code (1957, 1973

Repl. Vol.) Art. 16, § 66 (e) which requires any action to establish an individual as the father of an illegitimate child to "be commenced during the pregnancy of the mother thereof or within two (2) years after the birth of such child . . .; except that if the putative father of such child . . . has acknowledged in writing the paternity of the child . . . or has made payment or otherwise provided for the support and maintenance of the child . . ., it is sufficient if the proceedings are commenced within two (2) years of the date of such acknowledgment or the last such payment or provision . . . ." We shall decline to do so, as did the Court of Special Appeals in *Thompson v. Thompson,* 40 Md. App. 256, 390 A. 2d 1139 (1978).

The child in question was born May 10, 1969. On December 1, 1971, her mother filed a paternity action against the alleged father in the Circuit Court for Anne Arundel County. The matter lay dormant until August 10, 1977. On that day the State's Attorney for Anne Arundel County requested that summons be issued for the mother, the alleged father, and another individual for a hearing to be held on August 31.[1] The

---

1. At the hearing on August 31 the State's Attorney advised the court of the name of the case after which the record in full is as follows:

Mr. Chartrand has recently filed an answer to the petition against this defendant in which he asserts the application of the statute of limitations and by the — Article 66 [sic], and the State has no defense to this with regards to the merits of it. The [defendant] was notified at a period beyond the limitations. The State has been approached by the Legal Aid Bureau, particularly Mr. Sam Paavola, who indicates that they would like to intervene on behalf of the child and ask the Court to have a guardian appointed for the child and that they be allowed to represent the guardian *ad litem* for the purpose of raising the constitutionality of the limitations, as set forth in Article 66 [sic]. They have adequate law in support of the proposition that this may well be unconstitutional. They would like to submit this by way of a memorandum to the Court at a later time.

COURT: Alright, sir. How much time do you want to submit a memorandum to the Court?

MR. PAAVOLA: A three week period?

COURT: Alright.

MR. REINA [, Assistant State's Attorney]: Will you prepare that application to have the guardian *ad litem* appointed?

MR. PAAVOLA: Uh-huh.

COURT: Alright. You submit the petition and I'll sign the order and we'll proceed after that.

alleged father filed an answer on August 29 claiming the action was barred by limitations. The trial judge dismissed the action on October 13 pursuant to that contention.[2] The minor child claims that this two year statute of limitations denies "equal protection of the law to all those illegitimate children who do not file a paternity action within two years of birth." [3]

The present statutory provisions governing paternity actions are found in Code (1957, 1973 Repl. Vol., 1978 Cum. Supp.) Art. 16, §§ 66A-66P, originally enacted by Chapter 722 of the Acts of 1963. Under these statutes an action such as the case at bar is civil in nature. Prior to that revision of our laws such proceedings were criminal in nature, although the effect of the prior law was to extract support from the father of an illegitimate child. *See, e.g.,* Code (1957) Art. 12, "Bastardy and Fornication" (repealed by the 1963 Act); *Sheay*

---

The next docket entry reflects the filing of a memorandum of law on October 10. On the same day present counsel for the child filed a motion "*for appointment of separate counsel*" for the child. The court passed an order on October 11 pursuant to that motion appointing that attorney as "counsel for the minor child, Michelle Thompson." The action was dismissed on October 13 as "barred by the statute of limitations." The next docket entry is an order for an appeal signed by the same attorney. It does not specify for whom he is attorney, although the inference certainly may be drawn that he was acting as attorney for the child.

The foregoing constitutes a complete summary of all that was filed in this proceeding. At no time was there a request that the minor child be made a party plaintiff. No order was ever passed making her a party plaintiff. No appeal was filed on behalf of the plaintiff mother. No order was ever passed appointing anyone as guardian ad litem for the child.

Because it seems implicit in the trial judge's comments and the statements of counsel at the August 31 hearing that some action was to be taken, we shall treat the matter as though a motion on behalf of the infant to intervene was granted.

2. Maryland Rule 18 b states:

Before or within fifteen days after entry of an appealable final judgment in a contested action tried upon the merits without a jury, the court shall dictate to the court stenographer or reporter, or prepare and file in the action, a brief statement of the grounds for its decision and the basis of determining the damages, if any.

Counsel in this case requested the trial judge to state the reasons for his decision, referring to this rule. No memorandum was ever filed, perhaps on the theory that this case was not "tried upon the merits . . . ." We observe, however, that it would have been of assistance to the appellate courts to have had the benefit of the reasoning of the trial judge.

3. Undoubtedly what she means is that equal protection of the law is denied to those illegitimate children whose mother fails to file a paternity action within two years of birth, since the child may not institute such an action.

*v. State,* 74 Md. 52, 21 A. 607 (1891); *Bake v. State,* 21 Md. 422 (1864); *Owens v. State,* 10 Md. 164 (1856); and *Oldham v. State,* 5 Gill. 90 (1847). Art. 12, § 18 provided for limitations of two years from birth or "from the last payment by the accused for the maintenance and support of the said bastard child," a provision enacted by Chapter 163 of the Acts of 1912. Earlier in our legal history the one year limitation provision applicable to misdemeanors found in Code (1912) Art. 57, § 11 and its predecessors was applicable to a prosecution for bastardy. *Bake v. State, supra.*

The present statutory scheme came about as a result of the report of the Commission to Study Problems of Illegitimacy among the Recipients of Public Welfare Monies in the Program for Aid to Dependent Children (1961). The General Assembly declared its purposes in § 66A:

> The General Assembly declares its conviction that the State has a duty to ameliorate the deprived social and economic status of children born out of wedlock and that the policies and procedures as contained in this subtitle and in § 66 of this article relative to establishing the paternity of such children, determining who shall have their custody or guardianship and who shall be charged with their maintenance and support are socially necessary and desirable, having as their threefold purpose (1) the promotion of the general welfare and best interests of such children by securing to them, as near as practical, the same right to support, care and education as legitimate children; (2) the imposition upon both parents of such children the basic obligations and responsibilities of parenthood and (3) the simplification of procedures.

The same act made the necessary changes to Art. 16, § 66 so that the limitation period found in the old bastardy law was refined and placed in it. Although the mother is represented by the State's Attorney, the proceeding is civil in nature. *See Dorsey v. English,* 283 Md. 522, 530, 390 A. 2d 1133 (1978), where we dubbed as "frivolous and unworthy of further

comment" an allegation that a mother received an unfair advantage by being represented by the State's Attorney.

The minor child suggested repeatedly in argument to us that illegitimate children are entitled to a favored status. We find no support for such a contention in any of the decisions of the Supreme Court. For instance, in *Trimble v. Gordon,* 430 U. S. 762, 97 S. Ct. 1459, 52 L.Ed.2d 31 (1977), Mr. Justice Powell said for the Court:

> Appellants urge us to hold that classifications based on illegitimacy are "suspect," so that any justifications must survive "strict scrutiny." We considered and rejected a similar argument last Term in *Mathews v. Lucas,* 427 U.S. 495 (1976). As we recognized in *Lucas,* illegitimacy is analogous in many respects to the personal characteristics that have been held to be suspect when used as the basis of statutory differentiations. *Id.,* at 505. We nevertheless concluded that the analogy was not sufficient to require "our most exacting scrutiny." *Id.,* at 506. Despite the conclusion that classifications based on illegitimacy fall in a "realm of less than strictest scrutiny," *Lucas* also establishes that the scrutiny "is not a toothless one," *id.,* at 510, a proposition clearly demonstrated by our previous decisions in this area. [*Id.* at 767.]

This should dispose of any argument that such persons are entitled to a special status.

In *Weber v. Aetna Casualty & Surety Co.,* 406 U. S. 164, 92 S. Ct. 1400, 31 L.Ed.2d 768 (1972), Mr. Justice Powell said for the Court:

> The tests to determine the validity of state statutes under the Equal Protection Clause have been variously expressed, but this Court requires, at a minimum, that a statutory classification bear some rational relationship to a legitimate state purpose. *Morey v. Doud,* 354 U. S. 457 (1957); *Williamson v. Lee Optical Co.,* 348 U. S. 483 (1955); *Gulf, Colorado*

*& Santa Fe R. Co. v. Ellis,* 165 U. S. 150 (1897); *Yick Wo v. Hopkins,* 118 U. S. 356 (1886). Though the latitude given state economic and social regulation is necessarily broad, when state statutory classifications approach sensitive and fundamental personal rights, this Court exercises a stricter scrutiny, *Brown v. Board of Education,* 347 U. S. 483 (1954); *Harper v. Virginia Board of Elections,* 383 U. S. 663 (1966). The essential inquiry in all the foregoing cases is, however, inevitably a dual one: What legitimate state interest does the classification promote? What fundamental personal rights might the classification endanger? [*Id.* at 172-73.]

This test was repeated in *Mathews v. Lucas,* 427 U. S. 495, 504, 96 S. Ct. 2755, 49 L.Ed.2d 651 (1976). We believe it to be the test by which the validity of this particular statute should be determined. As recently as last December Mr. Justice Powell said in the plurality opinion in *Lalli v. Lalli,* 439 U. S. 259, 99 S. Ct. 518, 527, 58 L.Ed.2d 503 (1978), "Our inquiry under the Equal Protection Clause does not focus on the abstract 'fairness' of a state law, but on whether the statute's relation to the state interests it is intended to promote is so tenuous that it lacks the rationality contemplated by the Fourteenth Amendment."

The purpose of a statute of limitations has been explained in a host of Maryland cases. *See, e.g., Harig v. Johns-Manville Products,* 284 Md. 70, 75-76, 394 A. 2d 299 (1978); *Walko Corp. v. Burger Chef,* 281 Md. 207, 210-11, 378 A. 2d 1100 (1977); *Yingling v. Smith,* 259 Md. 260, 264, 269 A. 2d 612 (1970); and *Bertonazzi v. Hillman,* 241 Md. 361, 367, 216 A. 2d 723 (1966), although not in precisely the same words each time. Such statutes are designed primarily to assure fairness to defendants on the theory that claims asserted after evidence is gone, memories have faded, and witnesses disappeared are so stale as to be unjust, being somewhat similar to some of the factors considered in determining whether an accused has been denied his right of speedy trial as guaranteed by the Maryland Declaration of Rights or the Sixth Amendment to the Constitution of the United States. In *Harig* Chief Judge

Murphy commented for the Court relative to limitations, "Ordinarily, a potential tort plaintiff is immediately aware that he has been wronged." *Id.* at 76. Although a woman may not know immediately that she has conceived, certainly it follows that by the very nature of things it is not long after conception before she is aware of that fact. Judge Delaplaine said for our predecessors in *McMahan v. Dorchester Fert. Co.,* 184 Md. 155, 40 A. 2d 313 (1944):

> Statutes of limitations are remedial legislation and rest upon sound public policy, for they are enacted to afford protection against stale claims after a lapse of time which ought to be sufficient for a person of ordinary diligence, and after which the defendant might be placed at a disadvantage by reason of long delay. By requiring persons to seek redress by actions at law within a reasonable time, the Legislature imposes a salutary vigilance and puts an end to litigation. [*Id.* at 159-60.]

As Mr. Justice Powell so cogently said for the Court in *Lalli:*

> Establishing maternity is seldom difficult. As one New York Surrogate's Court has observed, "the birth of the child is a recorded or registered event usually taking place in the presence of others. In most cases the child remains with the mother and for a time is necessarily reared by her. That the child is the child of a particular woman is rarely difficult to prove." *In re Oritz,* 60 Misc.2d 756, 761, 303 N.Y.S.2d 806, 812 (Sur. Ct. 1969). Proof of paternity, by contrast, frequently is difficult when the father is not part of a formal family unit. "The putative father often goes his way unconscious of the birth of a child. Even if conscious, he is very often totally unconcerned because of the absence of any ties to the mother. Indeed the mother may not know *who* is responsible for her pregnancy." *Ibid.* (emphasis in original); accord, *In re Flemm,* 85 Misc.2d 855, 861, 381 N.Y.S.2d 573, 576-577 (Sur. Ct. 1975); *In re*

*Hendrix,* 68 Misc.2d [439], 443, 326 N.Y.S.2d [646], 650 [(Sur. Ct. 1971)]; cf. *Trimble* [*v. Gordon*], 430 U. S. [762], 770, 772, 97 S. Ct. [1459], 1465, 1466 [, 52 L. Ed. 2d 31 (1977)]. [*Id.* 439 U. S. 268-69, 99 S. Ct. 525.]

Memories do fade with the passage of time. Circumstances change, too. After the lapse of a number of years from contact with the mother of an illegitimate child an accused male might have substantial difficulty in establishing that he was not the only individual who could have sired the child in question. This might be because changed family circumstances could cause individuals who previously would have so testified to be unwilling to state that they had sexual intercourse with the child's mother at a time when they could have sired the child in question. In today's society where movement from one area to another is much more frequent than in earlier generations the whereabouts of such individuals may no longer be readily ascertained. We find no fundamental right of the child affected by this statute.

Judge Morton said for the Court of Special Appeals in this case, *Thompson v. Thompson,* 40 Md. App. 256:

> Finally, we find no merit in appellant's contention that the two year statute of limitations violates her right to due process under the fourteenth amendment because it allows her right to paternal support to terminate before she has any real opportunity to assert it. Appellant posits that permitting a child's mother to institute paternity proceedings in behalf of her offspring does not thereby satisfy the requirements of due process because the mother's short term interests, viz., continuing fondness for the father or her reluctance publicly to reveal her indiscretion, may conflict with the child's long term interests of support and the establishment of paternity. There is no denying that this possibility exists. In our opinion, however, the Maryland General Assembly could reasonably conclude that the decision whether to institute a paternity action is in the child's best interest, in

> contrast to the mother's, vests with the mother. Certainly, we feel that it is reasonable for the legislature to conclude that this policy decision, when coupled with the state's legitimate interest in preventing stale or fraudulent claims, on balance, outweighs the potential harm to illegitimate children who may have their right to paternal support forfeited by the mother's inaction. We also observe that the failure to bring a paternity suit within two years forecloses only the right to support from the alleged natural father. The child, however, will not be left without a means of support. The natural mother is still bound, under fear of criminal prosecution, to support her child, Maryland Code [(1957, 1976 Repl. Vol., 1978 Cum. Supp.)], art. 27, § 88 (b) (1), and, if necessary, the child will be eligible to receive support from public funds. [*Id.* 40 Md. App. 265-66.]

We adopt those views as our own.

In arguing that there are less restrictive means than this statute of limitations for protecting accused individuals against unfounded claims, the minor child refers to a number of scholarly articles concerning testing. She then asserts, "Through an analysis of the various genetic characteristics that are within each blood cell of an individual, scientists can determine with scientific certainty in 99 percent of the cases that a falsely accused man is not the father." Art. 16, § 66G provides for blood tests with the results to be received in evidence "only in cases where definite exclusion is established." This statute is virtually identical to its predecessor, Code (1957) Art. 12, § 20, which Chief Judge Marbury discussed for the Court in *Shanks v. State,* 185 Md. 437, 45 A. 2d 85 (1945):

> The paternity tests are based upon further scientific discoveries, that the child of two people having the same blood group cannot be in one of the other blood groups, but if the two parents have different blood grouping, then a different situation

arises. The statutes, including the Maryland statute above referred to, generally provide, and the cases generally hold, that blood tests in paternity cases are only evidence in case definite exclusion is established. That means that if the child has blood O, and both the mother and the putative father have blood O, that is no evidence that the putative father is really the father, because 45 per cent. of the population have that same blood. But if the child has blood A and both the mother and the putative father have blood O, then it is evidence to exclude the father, because a combination of two persons both with blood O cannot produce a child with group A. [*Id.* at 441.]

*See* Bowen, *Blood Tests and Parentage,* 18 Md. L. Rev. 111 (1958). Mr. Bowen states relative to the old statute that it "does not indicate what weight should be given to the results of blood tests when they are admitted in evidence nor has the Court of Appeals ruled upon the question . . . ." *Id.* at 117-18. The new statute likewise is silent on this point. We still have not ruled upon the question. We understand the blood tests suggested by the minor child here are far more complex and sophisticated than the methods in vogue in Maryland which were discussed in *Shanks* and by Mr. Bowen. No attempt was made to offer evidence as to the reliability of the tests which the minor mentions. In *Reed v. State,* 283 Md. 374, 389, 391 A. 2d 364 (1978), this Court adopted the rule relative to the admissibility of scientific evidence laid down in *Frye v. United States,* 293 F. 1013, 1014 (D. C. Cir. 1923). Thus, for us to take cognizance of such a scientific blood testing technique it would have been incumbent upon the minor child to adduce evidence showing that this technique is sufficiently established to have gained general acceptance in its particular field.[4]

---

4. There having been no evidence adduced on the point, we express no opinion as to whether such techniques could meet the test laid down in *Reed* and *Frye.* We point out, however, that H. Krause, *Illegitimacy: Law and Social Policy* 133 (1971), found that as many as one-third of test results were wrong in a sample series of cases, while Lee, *Current Status of Paternity Testing,* 9 Family L.Q. 615, 633 (1975), says that current techniques in blood-testing, if properly performed, are accurate between 70 percent and 90 percent of the time.

There is a strong presumption of constitutionality of a statute and it is the duty of the party assailing a legislative classification to prove that it does not rest upon any reasonable basis, but is essentially arbitrary. *Edgewood Nursing Home v. Maxwell,* 282 Md. 422, 427, 384 A. 2d 748 (1978); *Weaver v. Prince George's County,* 281 Md. 349, 355, 379 A. 2d 399 (1977); *Davidson v. Miller,* 276 Md. 54, 79, 344 A. 2d 422 (1975); and *Matter of Trader,* 272 Md. 364, 400, 325 A. 2d 398 (1974). We find that the minor child has not sustained this burden of proof and that the statute in question meets the test enunciated by the Supreme Court in *Weber.*

*Judgment affirmed; petitioner to pay the costs.*