901 A.2d 825

**Victoria TREMBOW**

v.

**Alan SCHONFELD.**

**No.  64, Sept. Term, 2005.**

Court of Appeals of Maryland.

June 8, 2006.

Brian D. Wise (Dorothy R. Fait of Fait & Wise, L.L.P., Rockville, MD), on brief, for Appellant.

Cynthia E. Young, Annapolis, MD (Jo Benson Fogel of Jo Benson Fogel, P.A., Rockville, MD), on brief, for Appellee.

Argued Before: BELL, C.J., and RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

WILNER, J.

The issue before us is whether the mother of a destitute adult child born out of wedlock is entitled to pursue a paternity action against the man she now claims is the father of the child and collect child support from him. The issue involves the interplay between the State paternity law (Maryland Code, §§ 5–1001 through 5–1044 of the Family Law Article) (FL), and the law requiring parents to support their destitute adult children (FL §§ 13–101 through 13–109).

We shall conclude that the mother is not entitled to pursue a paternity action after the child has turned 18 and is no longer in high school.[1] We shall point out, however, that (1) had paternity been established prior to that point, the mother

---

1. FL § 5–203(b) makes the parents of a "minor child," as defined in Art. 1 § 24 of the Code, jointly and severally responsible for the child's support, care, nurture, welfare, and education. Art. 1 § 24 provides:

   "A person who has attained the age of 18 years and who is enrolled in secondary school has the right to receive support and maintenance from both of the person's parents until the first to occur of the following events:
   (i) The person dies;
   (ii) The person marries;
   (iii) The person is emancipated;
   (iv) The person graduates from or is no longer enrolled in secondary school; or
   (v) The person attains the age of 19 years."

   By reason of those statutes, the duty to support a "minor child" can actually extend for a period beyond the child's eighteenth birthday—until the child either is no longer in secondary school or turns 19. To the extent of that additional up-to-one-year period, that may have an effect on the validity or enforceability of the statute of limitations for bringing a paternity action. The traditional notion that the duty to support a minor child exists only until the child turns 18 is no longer entirely accurate in Maryland. Strictly for convenience, however, we shall use age 18 as the cutoff of the support obligation for minor children, to avoid having to repeat these various extensions and exceptions.

*would* be entitled to seek child support for the destitute adult child, and (2) the child, directly or, if incompetent, through a guardian, is independently entitled to seek to establish paternity prior to reaching that point and upon the ascertainment of paternity, to recover child support both during minority and, as a destitute adult child, thereafter.

## BACKGROUND

In August, 2003, appellant Victoria Trembow, filed a complaint in the Circuit Court for Frederick County seeking child support from appellee, Alan Schonfeld. She alleged that, though never married to each other, the parties had a child, Ivan, who was born in March, 1983. In 1996, she claimed, when Ivan was thirteen, he was diagnosed with a genetic degenerative bone disorder, as a result of which he had become permanently disabled before reaching the age of 18. The complaint alleged that Ivan resided with Ms. Trembow and, by reason of his physical disability, was unable to earn sufficient means to provide for himself.

Implicit from the complaint, and undisputed, is that Ms. Trembow never sought to establish Schonfeld's paternity or collect child support from him prior to Ivan reaching eighteen. The record indicates that, within six months after Ivan was born, Ms. Trembow married one John O'Brien, and Ivan was raised as Ivan O'Brien. Not until after the couple was divorced and Ivan reached eighteen did he change his name to Ivan Trembow.

Ms. Trembow averred that Schonfeld, in correspondence, had acknowledged himself to be Ivan's father but had consistently refused to provide support for Ivan though financially able to do so. Invoking FL § 13–102, Ms. Trembow asked that the court establish Schonfeld's obligation to provide support, establish any arrearage, enter an earnings withholding order, and award her costs and other unspecified relief. The action was filed solely by Ms. Trembow, individually, not on behalf of Ivan, and the support she sought was to be paid to her, not to Ivan. Although she alleged Ivan's physical disabilities and that

he suffered from depression, she did not allege that Ivan was or had ever been incompetent to pursue his own action if he chose to do so.

Schonfeld, a California resident, moved to dismiss the complaint on a number of grounds, including that the complaint was not timely filed, that Ms. Trembow had no standing to file such an action, that the action was not permitted by any statute, that the complaint failed to state a claim upon which relief could be granted, and that the plaintiff was equitably estopped from bringing the action. In June, 2004, the court granted the motion to dismiss but gave leave to Ms. Trembow to file an amended complaint. The order dismissing the complaint does not specify any reason; nor is there anything else in the record to indicate on what ground(s) the complaint was dismissed.

In July, 2004, Ms. Trembow filed an amended two-count complaint. Count II was a repetition of the claim for support pled in the initial complaint. Count I was an action to establish Schonfeld's paternity. Ms. Trembow averred that Schonfeld's paternity "needs to be determined so that Plaintiff can proceed with her request for child support for her disabled adult child." As with the initial complaint, the action was brought solely by and for the benefit of Ms. Trembow. There is no indication that Ivan was seeking either to establish Schonfeld's paternity or to collect child support from him. Schonfeld again responded with a motion to dismiss, contending, in addition to lack of jurisdiction and venue, that the action was not timely filed, that it failed to state a claim upon which relief could be granted, and estoppel. He argued that he had never acknowledged paternity or in any other way "legitimated" Ivan and that the paternity action was barred by limitations.

After hearing argument, the court dismissed the amended complaint. Although the order does not specify the ground(s) of the dismissal, the court's remarks from the bench indicate that the dismissal was based on a finding that the paternity action was barred by limitations. Ms. Trembow filed a motion

to alter or amend the order of dismissal, in which she re-argued that the statute of limitations on filing paternity actions was not applicable to actions involving a destitute adult child. She attached to the motion various letters and other correspondence from Schonfeld, which established, in her view, that Schonfeld could not be said to have relied on not being Ivan's father. The motion was denied and the attached correspondence was stricken. Ms. Trembow appealed, and we granted *certiorari* prior to proceedings in the Court of Special Appeals.

The one question presented in appellant's brief is "whether an adult disabled child may initiate proceedings for paternity and child support after his eighteenth birthday." *That,* unfortunately, is *not* the issue presented in this case. As noted, Ivan has not initiated any proceedings for paternity or support, nor did Ms. Trembow file her action as guardian for or next friend of Ivan. The issue actually presented is whether Ms. Trembow, for her own benefit, is entitled to pursue a paternity action after the child's eighteenth birthday.

## DISCUSSION

As noted, there are two sets of statutes that are relevant here—FL §§ 13–101 through 13–109, establishing the duty of parents to support their destitute adult children, and FL, §§ 5–1001 through 5–1044, which constitutes the paternity law and sets forth the procedure for establishing paternity. The two statutes are inextricably related in this case. Ms. Trembow has acknowledged that fact in her admission that she needed to establish Schonfeld's paternity so that she could proceed with her action for support.

At common law, a parent had no duty to support an adult child—a child who had reached the age of majority—even if the child was disabled. *See Smith v. Smith,* 227 Md. 355, 359, 176 A.2d 862, 865 (1962); *Borchert v. Borchert,* 185 Md. 586, 590, 45 A.2d 463, 465 (1946). That obligation was first imposed, by statute, in 1947. The history and antecedents of that statute—the one now codified in FL §§ 13–101 through

13–109—provide an enlightening context for its structure, wording, and effect.

In 1896, the Legislature made it a criminal offense, punishable by a fine of $100 and one year imprisonment, for a man wilfully to desert or neglect to provide support and maintenance of his wife or minor child. *See* 1896 Md. Laws, ch. 73. In 1916, the Legislature made it a criminal offense for an adult person, able to do so, to fail to provide support to his or her destitute parent.[2] On conviction, the adult child could be fined $500 and imprisoned for a year. *See* 1916 Md. Laws, ch. 637. The 1916 law permitted the court, either with the consent of the defendant or after conviction in lieu of punishment, to order the person to pay a weekly sum to the parent for up to two years. In that event, the adult child was placed on probation; if the child violated the order, the probation could be revoked and sentence imposed.

It was always clear that the obligation of parents to support their minor children could be implemented not just through the criminal statute, but also in equity proceedings—actions for divorce or for support. When, in any such proceeding, the court awarded custody of a minor child to one parent, it normally ordered the other, non-custodial, parent to pay child support to the custodial parent.

In *Borchert v. Borchert, supra,* 185 Md. 586, 45 A.2d 463, a divorce case, the wife sought child support for a disabled *adult* child of the parties who was living with her. The Court noted the statutory duty to support minor children, the 1916 statute requiring adult children to support destitute parents, and the absence of any reciprocal obligation on the part of a parent to support a destitute adult child. The Court observed that there was a trend in the country, either through statute or judicial expansion of the common law, to recognize such a

---

**2.** In 1952, that obligation was extended to minor children of a destitute parent, but in 1984, with the enactment of the Family Law Article, it was again limited to adult children. *See* 1952 Md. Laws, ch. 36 and 1984 Md. Laws, ch. 296, enacting § 13–102, and Revisor's Note to that section.

duty, and that the father in that case had actually acknowledged that obligation, but it felt stymied in that the Legislature had not seen fit to provide any mechanism for enforcing that obligation. *Id.* at 594–95, 45 A.2d at 466. The Court thus concluded:

"The omission by the legislative branch of the government of such a statute is an indication that the failure to support an incapacitated child is placed by it on a different footing from the failure to support a minor child. We cannot now without further legislative action hold that the divorce statute attempted to be invoked in this case is enlarged to include other than minor children."

*Id.* at 595, 45 A.2d at 466–67.

At its next opportunity, the Legislature responded to that ruling. By 1947 Md. Laws, ch. 113, it imposed a duty on parents to support their destitute adult children but chose the same format for enforcing the obligation as it had for enforcing the duty to support destitute parents—a criminal proceeding. Nonetheless, in *Smith v. Smith, supra,* 227 Md. at 360, 176 A.2d at 865, an action for permanent alimony, the Court held that "[t]he passage of this act is a clear indication of legislative intent to place the failure to support an incapacitated child on equal footing with failure to support a minor child." On that premise, this Court affirmed an award of child support to the mother of the destitute adult child.

That holding was confirmed in *Sininger v. Sininger,* 300 Md. 604, 479 A.2d 1354 (1984), which emanated from a divorce case in which the wife/mother was awarded custody of the parties' three minor children and the husband was ordered to pay child support for them. The support obligation ended when the youngest of the three children came of age. Several months later, the mother filed a new complaint for support for one of the children who, after attaining majority, had become mentally ill and, as a result of that illness, a destitute adult child. The father resisted, arguing that, once the child had become emancipated, the support obligation ended and could not be revived.

The Court rejected that argument and concluded that it made no difference whether the disability creating the destitution arose prior to or after the child reached majority. *See also Presley v. Presley,* 65 Md.App. 265, 267, 500 A.2d 322, 327 (1985); *Freeburger v. Bichell,* 135 Md.App. 680, 686, 763 A.2d 1226, 1229 (2000). It is clear from these cases that, although the statutory mechanism for enforcing the duty of a parent to support a destitute adult child is a criminal proceeding instituted by a State's Attorney, the duty may be enforced as well through a family law action invoking the equity jurisdiction of the court. Had Schonfeld's paternity been established, both Ms. Trembow and Ivan would be entitled to pursue him for support.

The problem is that Schonfeld's paternity has *not* been established, and the question is whether Ms. Trembow is entitled now to file an action to establish it. That requires an examination of the paternity law which, on its face, precludes such an action by her at this point.

The legislative policy behind the current paternity law is set forth in FL § 5–1002—to promote the welfare and best interests of children born out of wedlock "by securing for them, as nearly as practicable, the same rights to support, care, and education as children born in wedlock," and to impose on both parents of children born out of wedlock "the basic obligations and responsibilities of parenthood." In furtherance of that policy, FL § 5–1005 permits an equity court to determine the "legitimacy" of a child pursuant to § 1–208 of the Estates and Trusts Article.[3] Section 1–208 states, in relevant part, that a child born to parents who have not participated in a marriage ceremony with each other is the child of an identified man only if that man (1) has been judicially determined to be the father in an action brought under the paternity law, (2) has acknowledged himself, in writing, to be the father, (3) has openly and

---

**3.** Although it has been common to refer to children born out of wedlock as "illegitimate," we have made clear on several occasions that there is no such thing as an "illegitimate" child. That term is a stigmatizing one that is wholly inappropriate. *See Carroll County v. Edelmann,* 320 Md. 150, 173, n. 6, 577 A.2d 14, 25, n. 6 (1990).

notoriously recognized the child to be his child, or (4) has subsequently married the mother and acknowledged himself orally or in writing to be the father.

FL § 5–1006—the statute principally at issue here—creates a special statute of limitations for a paternity action under § 5–1005. The normal period of limitations for a civil action is three years from the date the action accrues. *See* Maryland Code, § 5–101 of the Cts. & Jud. Proc. Article. Section 5–1006 permits a paternity action to be filed during the mother's pregnancy but specifies that "[a] proceeding to establish paternity of a child under this subtitle may be begun at any time before the child's eighteenth birthday." Notwithstanding the use of the word "may," that statute constitutes a statute of limitations. *See Thompson v. Thompson*, 285 Md. 488, 404 A.2d 269 (1979), *overruled on other grounds, Frick v. Maldonado*, 296 Md. 304, 462 A.2d 1206 (1983). On its face, the statute requires a paternity action to be brought prior to "the child's eighteenth birthday." That was not done here.

Ms. Trembow argues that the statute does not really mean what it plainly says—that there is some ambiguity in the meaning of the word "child" or in the meaning of "the child's eighteenth birthday." She looks at the definition of "child" in other statutes, where the Legislature, for the special purposes of those statutes, has defined "child" as including adult children, and concludes from those definitions that the undefined word, as used in FL § 5–1006, could possibly include a child over eighteen, at least if the child is a destitute adult child. She acknowledges that, only if § 5–1006 is regarded as legally ambiguous and given that expansive meaning—that "the child's eighteenth birthday" does not really mean the child's eighteenth birthday—can her action succeed. In positing that view of statutory construction, Ms. Trembow is wrong. The statute cannot properly be tortured in that way.

We have stated the rules governing statutory construction so often that only the most cursory repetition is necessary. Our goal is to ascertain and implement the legislative intent, and, if that intent is clear from the language of the

statute, giving that language its plain and ordinary meaning, we need go no further. We do not stretch the language used by the Legislature in order to create an ambiguity where none would otherwise exist. If there *is* some ambiguity in the language of the statute, either inherently or in a particular application, we may then resort to other indicia to determine the likely legislative intent. *See,* most recently, *Mackey v. Compass,* 391 Md. 117, 141, 892 A.2d 479, 493 (2006), *Comptroller v. Blanton,* 390 Md. 528, 536–37, 890 A.2d 279, 284 (2006); *Grandison v. State,* 390 Md. 412, 445, 889 A.2d 366, 385 (2005); *Gilmer v. State,* 389 Md. 656, 662–63, 887 A.2d 549, 553 (2005); *Design Kitchen v. Lagos,* 388 Md. 718, 728–29, 882 A.2d 817, 823 (2005).

There is nothing at all ambiguous about § 5–1006. It plainly says, and means, that, if a paternity action is to be brought, it must be filed before the child's eighteenth birthday. If it is filed thereafter, it is subject to dismissal upon a properly filed motion to dismiss. In context, "child" necessarily means a child under eighteen. It cannot mean anything else. The fact that, in other statutes, the Legislature has specifically defined the word "child" as either including persons over eighteen, or as limited to persons *under some younger age,* does not make the undefined word "child" as used in § 5–1006 in any way ambiguous.

Ordinarily, upon finding no ambiguity in the statutory language, we would halt our inquiry and not look at legislative history, or other external indicia. In this case, however, legislative history actually supports the plain meaning of the language and is therefore worth considering, not to create an ambiguity where none exists, but to establish that the Legislature knew precisely what it was doing when it decreed that paternity actions must be brought, if at all, prior to the child's eighteenth birthday.

Prior to 1963, paternity determinations were made pursuant to the old bastardy and fornication laws, which came to us from England and which we described in *Gill v. Ripley,* 352 Md. 754, 724 A.2d 88 (1999). The law required the mother of

a child born, or about to be born, out of wedlock to be brought before a justice of the peace and forced either to name the father or post a bond conditioned on her supporting the child. If she named the father, the man was apprehended on a warrant, and, unless he agreed to support the child and posted a bond to secure that obligation, a criminal information was filed accusing him of bastardy, and he was tried in criminal court to determine whether he was the father. If found guilty, the court entered a support order, and the defendant was then required to post a bond conditioned on supporting the child until the child was 18.[4] *See* Maryland Code (1957), Art. 12. Under that law, prosecutions had to be commenced within two years after delivery of the child unless the accused had made payments for the support of the child, in which event the prosecution could be brought within two years after the last payment.

In 1963, upon the recommendation of a legislatively authorized and gubernatorially appointed Commission to Study the Problems of Illegitimacy, the Legislature repealed the bastardy law and substituted instead a civil procedure for determining paternity and providing support to children born out of wedlock. *See* 1963 Md. Laws, ch. 722. That law, as amended from time to time, is what now appears in title 5, subtitle 10 of the Family Law Article. In the initial 1963 version, the law retained the two year statute of limitations included in the bastardy law. Section 66(e) of former Art. 16 required that paternity proceedings, be commenced during pregnancy or within two years after birth of the child or within two years after any acknowledgment of paternity or voluntary payment.

A relatively short statute of limitations for paternity actions was pretty much the rule at the time. Most States required that paternity actions, at least by the mother, be filed within one, two, or three years after the birth of the child. In *Thompson v. Thompson, supra,* 285 Md. 488, 404 A.2d 269 (1979), this Court sustained the two-year statute of limitations

---

4. Even though the age of majority at the time was 21, the duty of support extended only to the age of 18.

in the Maryland law against a challenge that it denied children born out of wedlock equal protection of the laws.

Shortly after *Thompson* was decided, the Supreme Court began to look askance at State laws that discriminated against children born out of wedlock. In *Gomez v. Perez*, 409 U.S. 535, 93 S.Ct. 872, 35 L.Ed.2d 56 (1973), the Court struck down a Texas common law doctrine that children born out of wedlock had no right to any support from their father, even though the law required fathers to support their "legitimate" children. The Court recognized "the lurking problems with respect to proof of paternity," but concluded that they could not "be made into an impenetrable barrier that works to shield otherwise invidious discrimination." *Id.* at 538, 93 S.Ct. at 875, 35 L.Ed.2d at 60.

In response to *Gomez*, Texas enacted a law giving children born out of wedlock the right to seek support by establishing paternity but required that such an action be brought before the child reached the age of one. The Court struck that down as well. If the equal protection principles underlying *Gomez* were to have any meaning, the Court said, "[t]he period for asserting the right to support must be sufficiently long to permit those who normally have an interest in such children to bring an action on their behalf despite the difficult personal, family, and financial circumstances that often surround the birth of a child outside of wedlock." *Mills v. Habluetzel*, 456 U.S. 91, 97, 102 S.Ct. 1549, 1553, 71 L.Ed.2d 770, 776 (1982). Though applying equal protection principles to the statute of limitations for determining paternity, the *Mills* Court expressly declined to create absolute parity between children born in and out of wedlock, noting that "[p]aternal support suits on behalf of illegitimate children contain an element that such suits for legitimate children do not contain: proof of paternity." *Id.* at 97, 102 S.Ct. at 1554, 71 L.Ed.2d at 777. It continued:

"Therefore, in support suits by illegitimate children more than in support suits by legitimate children, the State has an interest in preventing the prosecution of stale or fraudulent claims, and may impose greater restrictions on the

> former than it imposes on the latter. Such restrictions will survive equal protection scrutiny to the extent they are substantially related to a legitimate state interest. . . . The State's interest in avoiding the litigation of stale or fraudulent claims will justify those periods of limitation that are sufficiently long to present a real threat of loss or diminution of evidence, or an increased vulnerability to fraudulent claims." (Internal citations omitted).

*Id.* at 98–99, 102 S.Ct. at 1554–55, 71 L.Ed.2d at 777–78. The deficiency in the one-year statute was that it was unrealistically short and was not substantially related to the State's interest in avoiding the prosecution of stale or fraudulent claims.

While *Mills* was pending, Texas amended its law to provide a four-year statute of limitations for paternity actions. That prompted a concurring Opinion by Justice O'Connor, who expressed concern that the striking down of the one-year statute may be misinterpreted as approving the current four-year statute. She observed that, while the State has a legitimate interest in precluding stale or fraudulent claims, it also has an interest in ensuring that genuine claims are not denied. Noting some of the practical difficulties in bringing paternity actions, Justice O'Connor asserted that "[t]he risk that the child will find himself without financial support from his natural father seems as likely throughout his minority as during the first year of his life." *Id.* at 106, 102 S.Ct. at 1558, 71 L.Ed.2d at 782. She thus concluded that the factors used in invalidating the one-year statute indicate "that longer periods of limitation for paternity suits also may be unconstitutional." *Id.*

A year later, the Court struck down a two-year Tennessee statute of limitations, nearly identical to the then-current Maryland statute, as also being too short. *See Pickett v. Brown*, 462 U.S. 1, 103 S.Ct. 2199, 76 L.Ed.2d 372 (1983). The Court observed that "the relationship between a statute of limitations and the State's interest in preventing the litigation of stale or fraudulent paternity claims has become more attenuated as scientific advances in blood testing have alleviat-

ed the problems of proof surrounding paternity actions." *Id.* at 17, 103 S.Ct. at 2208, 76 L.Ed.2d at 385. Based on *Mills* and *Pickett,* this Court, in *Frick v. Maldonado, supra,* 296 Md. 304, 462 A.2d 1206, expressly overruled *Thompson,* and declared the Maryland two-year statute of limitations unconstitutional.

What ultimately changed the landscape in this area and led to statutes permitting paternity actions to be brought within 18, 19, 20, or 21 years was the Federal Child Support Enforcement Amendments (P.L. 98–378) enacted by Congress in 1984. Intended to strengthen State efforts at child support enforcement, the Act tied Federal financial incentives and support to the adoption of State plans that complied with standards set forth in the Act. One of those requirements, now codified in 42 U.S.C. § 666(a)(5), is that the State have a law establishing "[p]rocedures which permit the establishment of the paternity of a child at any time before the child attains 18 years of age." Congress recognized that the advancement in testing for genetic markers made identification much easier and that much of the impetus for short periods of limitations was no longer a factor. The House Ways and Means Committee Report on the House version of the bill (H. Rep. 98–527 accompanying H.R. 4325) noted:

"Relatively short statutes of limitation were enacted in the past in order to prevent stale claims and to protect a man from having to defend himself against a paternity action brought years after the child's birth when witnesses may have disappeared and memories may have become faulty. Recent progress in developing highly specific tests for genetic markers now permits the exclusion of over 99 percent of those wrongly accused of paternity regardless of the age of the child. These advances in scientific paternity testing eliminate the rationale for placing arbitrary time limitations on the establishment of paternity for a child and therefore the obligation to support that child."

In order to conform with the Federal requirement and thus continue to receive the significant Federal financial assistance provided for public welfare programs, most of the States,

including Maryland, eventually amended their paternity laws to provide for a longer statute of limitations. Interestingly, Maryland's initial reaction to both the Federal requirement and the antecedent judicial decisions was to repeal the statute of limitations applicable to paternity actions altogether. *See* 1985 Md. Laws, ch. 451. The Act referenced both *Pickett v. Brown* and *Frick v. Maldonado*, striking down two-year periods of limitations, and, in light thereof, amended § 5–1006 to eliminate completely any limitations period.[5] For ten years, until 1995, § 5–1006 said merely that a paternity proceeding may be begun during pregnancy and was not barred because the child was conceived or born outside Maryland.

The eighteen-year limitations period (plus the period of pregnancy) was inserted in 1995, as part of a reaction to this Court's decision in *Tandra S. v. Tyrone W.*, 336 Md. 303, 648 A.2d 439 (1994). In *Tandra S.*, this Court concluded that a circuit court had no authority to vacate an enrolled judgment establishing paternity, even if the motion to vacate is based on a post-judgment blood test or testimony from the mother that the judicially-determined father was not, in fact, the father. At its next session, the General Assembly, through the enactment of 1995 Md. Laws, ch. 248, overturned that decision. *See Langston v. Riffe*, 359 Md. 396, 405, 754 A.2d 389, 393 (2000). As part of the bill doing so, it rewrote § 5–1006 expressly to

---

**5.** The legislative history of ch. 451 further confirms the basis for the repeal. As introduced, the bill (H.B.1518) would have merely lengthened the current two-year statute of limitations to three years—the general period of limitations for civil actions. Concern was expressed by a number of witnesses, however, that a three-year period would also be unconstitutional and that there should be no limit as to when a paternity action could be filed. The focus was clearly on the support of minor children, not adults, and the point was made that allowing a paternity action to be brought at any time before the child's eighteenth birthday was the equivalent of no statute of limitations. When the bill was amended to eliminate entirely the statute of limitations, the Executive Director of the Child Support Enforcement Administration advised the House Judiciary Committee that the Child Support Amendments of 1984 "include a requirement that *all* states adopt procedures which permit establishment of paternity at any time prior to a child's eighteenth birthday" and that "[w]e believe that House Bill 1518 would accomplish that end."

require that a proceeding to establish paternity "be begun at any time before the child's eighteenth birthday." The title to the bill states that the new language was to "clarif[y] the statute of limitations applicable to paternity proceedings," which, as to minor children, it did. As to *them*, there was really no change: there was no statute of limitations at all.

The current version of § 5-1006 essentially adopts the standard required by the 1984 Federal Act and is consistent with the law throughout the country. It appears that, in addition to Maryland, fourteen States have statutes requiring that a paternity action filed by a parent be brought before the child's eighteenth birthday.[6] Eighteen other States have limitations periods that extend for some relatively brief fixed period beyond majority, but are not open-ended.[7] Sixteen States have no specific time limitations in their paternity statutes, as was the case in Maryland for ten years, although in five of them (Delaware, North Dakota, Texas, Utah, and Wyoming) only the child may bring a paternity action after reaching the age of majority.[8] Thus, in 37 States, there is no

---

6. Arizona, Colorado, Connecticut, Idaho, Kentucky, Maine, Michigan, Nebraska, New Hampshire, North Carolina, Oklahoma, Pennsylvania, South Dakota, and West Virginia. In Colorado, a child may bring a paternity action within one year after the child's eighteenth birthday, whereas in Oklahoma and West Virginia, a child may bring a paternity action up to the child's twenty-first birthday.

7. Alabama—19; District of Columbia—21; Florida—four years after reaching majority; Hawaii—3 years after reaching majority; Illinois—2 years after reaching majority; Indiana—20 unless child is incompetent, then 2 years after becoming competent; Iowa—1 year after majority unless child has mental illness, then 1 year after termination of disability; Kansas—3 years after reaching majority; Mississippi—21; Montana—2 years after reaching majority; Nevada—3 years after reaching majority; New Jersey—5 years after reaching majority; New Mexico—3 years after reaching majority; New York—21; Ohio—5 years after reaching majority; Rhode Island—4 years after reaching majority; Tennessee—3 years after reaching majority; Vermont—3 years after reaching majority.

8. Arkansas, California, Delaware, Georgia, Louisiana, Massachusetts, Minnesota, Missouri, North Dakota, Oregon, South Carolina, Texas, Utah, Virginia, Washington, and Wyoming.

open-ended ability for a parent, such as Ms. Trembow, to bring a paternity action on her own behalf.

What we learn from all of this is that, with respect to minor children—the predominant, if not the sole, focus of both the Federal and State legislation dealing with the period of limitations for bringing a paternity action—the intent was to have *no* statute of limitations. Except possibly for that brief period after the child turns eighteen but remains in secondary school for up to an additional year, the requirement that an action be filed before the child's eighteenth birthday has significance only with respect to adult children. *Yet the Legislature was fully aware that destitute adult children had rights under the paternity law.* Section 5–1032(a) provides that, if the court finds that the alleged father *is* the father, it shall pass an order declaring him to be the father and providing support for the child. Section 5–1032(b) specifies:

"(1) The father shall pay the sum to be specified in the order until the first to occur of the following events:

(i) the child becomes an adult;

(ii) the child dies;

(iii) the child marries; or

(iv) the child becomes self-supporting.

(2) *If the child is an adult but is destitute and cannot be self-supporting because of a physical or mental infirmity, the court may require the father to **continue to pay support during the period of the infirmity.**"*

(Emphasis added).

■ As applied to Ms. Trembow, who, at any time from the moment she knew she was pregnant with Ivan until the child turned eighteen, could have filed a paternity action against Schonfeld, the statute is clear, valid, and enforceable. She was aware well before Ivan turned eighteen that he likely would become a destitute adult child when he reached that age. There was no procedural or substantive bar to her suing to establish paternity and obtain an order of support which, under our holdings in *Smith* and *Sininger,* could have been extended after Ivan turned eighteen. There is no justifiable

basis for torturing FL § 5–1006 to create an ambiguity that does not exist and then read the statute to mean what it plainly does not say and was never intended to say, in order to reward Ms. Trembow for sleeping on her rights for more than eighteen years.[9]

---

**9.** We need not consider here whether the situation would be different if Ivan had filed a paternity action after reaching eighteen, in order to pursue support as a destitute adult child. Facially, § 5–1006 applies to *any* paternity action.

In *Piselli v. 75th Street Medical,* 371 Md. 188, 808 A.2d 508 (2002), we held that application of a statute of limitations in such a way as would effectively preclude a person from pursuing an available cause of action before it was possible to bring that action was impermissible under Article 19 of the Maryland Declaration of Rights. The case involved a medical malpractice action to recover for injuries sustained by a child, an action that was required to be brought within three years after it accrued. The issue certified to this Court by the U.S. Court of Appeals for the Fourth Circuit was whether the action accrued when the child discovered the cause of the injury or when the parents made that discovery. We concluded that it was the former.

After restating the issue, we noted the long-standing principle that "statutory time limits for a minor to bring an action do not begin running until the age of majority has been firmly established in our law for a long time," *id.* at 212, 808 A.2d at 523, and confirmed that "[t]he fact that a guardian or next friend could have brought suit during the period of disability does not remove the case from the tolling principle." *Id.* at 214, 808 A.2d at 523, citing *Funk v. Wingert,* 134 Md. 523, 527, 107 A. 345, 346 (1919). The result of commencing the running of the statute of limitations when the child discovered the injury would be, effectively, to preclude the action because limitations would run before the child reached majority and was able to bring the action. Such a preclusion, we made clear in *Piselli,* would contravene Article 19 of the Maryland Declaration of Rights. We held there that "barring an injured child's . . . claim before the child is able to bring an action is an unreasonable restriction upon the child's right to a remedy and access to the courts guaranteed by Article 19 of the Maryland Declaration of Rights." *Piselli,* 371 Md. at 216, 808 A.2d at 524.

There is one clear distinction between the situation here and that considered in *Piselli.* FL § 5–1013 provides that a party under legal disability need not proceed by guardian, committee, or next friend, and, in *Jessica G. v. Hector M.,* 337 Md. 388, 653 A.2d 922 (1995), we held that a minor child had the right to bring a paternity action on her own, even after her mother had brought and abandoned one. The *Piselli* analysis, to that extent, does not fit exactly, therefore. Ivan could have brought a paternity action while still a minor. The effect of the eighteen-year statute of limitations would, however, preclude his bringing a paternity action as a destitute adult child. His right to establish paternity *for that purpose* arguably could be lost before he attained the

**JUDGMENT OF CIRCUIT COURT FOR FREDERICK COUNTY AFFIRMED, WITH COSTS.**

RAKER, J., dissenting.

Although the majority purports to respect the rights of nonmarital [1] children, disapproving of the description of such children as "illegitimate" because it is "stigmatizing" and "wholly inappropriate," [2] in reality, the majority's holding today perpetuates this country's regrettable history of invidious

---

status necessary to justify the action. Because Ivan has not pursued a paternity action on his own, we need not resolve that issue.

The dissent argues that the plainly worded, unambiguous statute somehow violates equal protection by discriminating against children born out of wedlock—children it calls "nonmarital" children. Although the dissent boldly proclaims that "[b]inding Supreme Court precedent establishes that the statute of limitations that the majority enforces against the appellant to bar her paternity action violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution," it cites no case from the Supreme Court or any other court that so holds or even suggests. It also fails to appreciate that Ms. Trembow is not a "nonmarital child." It fails to explain how or why the 18-year statute of limitations constitutes a violation of equal protection, which is understandable because there is no such violation. What the dissent seems to believe and, indeed expresses, is that *any* statute of limitations on a paternity action would be unconstitutional, a remarkable precept yet to be endorsed by anyone.

1. I use "nonmarital" rather than "illegitimate," and, in conjunction with my constitutional analysis, "classifications based on nonmarital child status" rather than "classifications based on illegitimacy," in recognition of the fact that characterization of nonmarital children as "illegitimate" carries the unwelcome connotation that nonmarital children are somehow of lesser worth than marital children. *See Clara C. v. William L.*, 96 N.Y.2d 244, 727 N.Y.S.2d 20, 750 N.E.2d 1068 (2001) (referring to nonmarital children); *Gerhardt, Guardian ad Litem for Heather Jo Krueger, v. Estate of Moore*, 150 Wis.2d 563, 441 N.W.2d 734 (Wis.1989) (referring to child out-of-wedlock as nonmarital child). It is the unequivocal public policy of this State that nonmarital children should, as nearly as possible, be possessed of the same rights and privileges as marital children. *See* Md.Code (1984, 2004 Repl.Vol., 2005 Cum.Supp.), § 5-1002(b)(1) of the Family Law Article (purpose of subtitle in Family Law Article governing paternity proceedings is "to promote the general welfare and best interests of children born out of wedlock by securing for them, as nearly as practicable, the same rights to support, care, and education as children born in wedlock").

2. *See* maj. op. at 335 n. 3, 901 A.2d at 830 n. 3.

and unconstitutional discrimination against nonmarital children. Binding Supreme Court precedent establishes that the statute of limitations that the majority enforces against the appellant to bar her paternity action violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. The majority, by wholly failing to even acknowledge, let alone address, appellant's persuasive equal protection argument, works a far greater injustice against nonmarital children than is done by describing them as "illegitimate." With respect, I dissent.

## I.

Md.Code (1984, 2004 Repl.Vol., 2005 Cum.Supp.), § 5–1006 of the Family Law Article,[3] provides as follows:

"(a) A proceeding to establish paternity of a child under this subtitle may be begun at any time before the child's eighteenth birthday.

(b) A paternity proceeding under this subtitle may be begun during pregnancy.

(c) A complaint under this subtitle is not barred because the child born out of wedlock was conceived or born outside this State."

Although I agree with the majority that the plain language of § 5–1006(a), if applied to appellant's paternity action, would bar the action,[4] I would hold that § 5–1006(a), as applied to

---

**3.** All subsequent section references herein shall be to the Family Law Article, Md.Code (1984, 2004 Repl.Vol., 2005 Cum.Supp.) unless otherwise indicated.

**4.** I do not agree, however, with the majority's assertion that the relevant legislative history behind § 5–1006(a) provides support for the plain language reading of the statute. *See* maj. op. at 338–46, 901 A.2d at 832–34. Until 1985, § 5–1006 provided for a two year statute of limitations on the initiation of paternity actions, subject to limited exceptions. *See* Md.Code (1984), § 5–1006(a) of the Family Law Article. In *Frick v. Maldonado*, 296 Md. 304, 462 A.2d 1206 (1983), we held that the two year statute of limitations for initiating paternity actions provided for in the predecessor of § 5–1006 was unconstitutional, following the Supreme Court's opinion in *Pickett v. Brown*, 462 U.S.

appellant's action to establish the paternity of her adult disabled child, violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Consequently, I would not apply § 5–1006(a) to bar appellant's paternity action. I reach this conclusion because under the framework established in *Mills v. Habluetzel,* 456 U.S. 91, 102 S.Ct. 1549, 71 L.Ed.2d 770 (1982), for the equal protection analysis of statutes of limitations on paternity actions, no statutory limitations period survives equal protection scrutiny given the increase in accuracy in paternity testing since 1982, the year *Mills* was decided.

---

1, 103 S.Ct. 2199, 76 L.Ed.2d 372 (1983). In response to our holding in *Frick,* the General Assembly amended § 5–1006 in 1985, enacting H.B. 1518, eliminating entirely the two-year limitations provision from § 5–1006. *See* 1985 Md. Laws, Chap. 451.

Although the purpose of H.B. 1518 seems clear enough from the session laws, the Bill file for H.B. 1518 reveals some confusion over the effect. In particular, evidence presented before the relevant House and Senate Committees indicates that there was confusion as to whether the three year statute of limitations in Md.Code (1974, 1984 Repl.Vol.), § 5–101 of the Courts and Judicial Proceedings Article applicable to civil actions generally would apply to paternity actions upon the repeal of the two year statute of limitations, or whether the effect of repeal would be to eliminate any statutory limitations on the initiation of paternity actions. *Compare* Letter from Martin McGuire, Office of the State's Attorney for Baltimore City, to the House Judicial Committee (Feb. 21, 1985) (three-year statute of limitations would apply) *with* Letter from Ann C. Helton, Executive Director of the Department of Human Resources, to the Senate Judicial Proceedings Committee (undated) (no limitations period would apply to paternity actions).

In 1995, the General Assembly again amended § 5–1006, enacting H.B. 337, adding the present version of § 5–1006(a). *See* 1995 Md. Laws, Chap. 248. The purpose for the change to § 5–1006, as stated in the purpose clause, was to "clari[fy] the statute of limitations applicable to paternity proceedings." Other than the statement in the purpose clause of Chap. 248, my review of the bill file for H.B. 337 reveals nothing relevant to the changes Chap. 248 made to § 5–1006.

The purpose clause of Chap. 248 itself is unrevealing. As detailed above, the legislative history behind the elimination of the two-year statute of limitations on paternity actions effectuated by Chap. 458 in 1985 reveals uncertainty as to whether the repeal of the then-effective version of § 5–1006(a) would have the effect of applying a three-year statute of limitations or no statute of limitations. In light of this uncertainty, it cannot be discerned from the legislative history what the legislature was clarifying when it undertook to clarify the statute of limitations applicable to paternity proceedings.

The Supreme Court has long held that statutory classifications based on nonmarital child status are subject to heightened scrutiny under the Equal Protection Clause. *See Pickett v. Brown,* 462 U.S. 1, 7–8, 103 S.Ct. 2199, 2203–04, 76 L.Ed.2d 372 (1983) (collecting and discussing cases). The Supreme Court first invalidated state laws that discriminated against nonmarital children in the companion cases of *Levy v. Louisiana,* 391 U.S. 68, 88 S.Ct. 1509, 20 L.Ed.2d 436 (1968) and *Glona v. American Guarantee & Liab. Ins. Co.,* 391 U.S. 73– 74, 88 S.Ct. 1515, 20 L.Ed.2d 441 (1968). In these cases, the Court was confronted with the issue of whether state wrongful death statutes that, in cases where a child was a plaintiff or a decedent, forbade recovery if the child was nonmarital violated the Equal Protection Clause. *See Glona,* 391 U.S. at 73, 88 S.Ct. at 1515–16; *Levy,* 391 U.S. at 69–70, 88 S.Ct. at 1510.

In *Levy,* the Court held that Louisiana's wrongful death statute violated the Equal Protection Clause because it permitted only marital children to bring suit to recover damages for the death of the child's mother. *Levy,* 391 U.S. at 72, 88 S.Ct. at 1511. The Court began by noting that nonmarital children "are not 'nonpersons,'" and as such are "persons" within the meaning of the Fourteenth Amendment. *Id.* at 70, 88 S.Ct. at 1510–11. The Court concluded that the classification in the Louisiana statute was "invidious," stating as follows:

"The rights asserted here involve the intimate, familial relationship between a child and his own mother. When the child's claim of damage for loss of his mother is in issue, why, in terms of 'equal protection,' should the tortfeasors go free merely because the child is illegitimate? Why should the illegitimate child be denied rights merely because of his birth out of wedlock? He certainly is subject to all the responsibilities of a citizen, including the payment of taxes and conscription under the Selective Service Act. How under our constitutional regime can he be denied correlative rights which other citizens enjoy?"

*Id.* at 71, 88 S.Ct. at 1511. In considering whether there was any relationship between the classification based on nonmari-

tal child status in the law and the purpose of the law, the Court was unable to find any such relationship, concluding that "[l]egitimacy or illegitimacy of birth has no relation to the nature of the wrong allegedly inflicted on the mother." *Id.* at 72, 88 S.Ct. at 1511.

In *Glona*, the Court held that the Louisiana wrongful death statute violated the Equal Protection Clause to the extent that it prohibited a mother of nonmarital children from recovering for the wrongful death of her children because they were nonmarital. *Glona*, 391 U.S. at 75–76, 88 S.Ct. at 1516–17. The Court observed that the issue presented was somewhat different from that in *Levy*, because the person disadvantaged by the classification on the basis of nonmarital child status, the mother, bore some responsibility for the fact that the child was nonmarital. *See id.* at 75, 88 S.Ct. at 1516. Thus, it could at least be argued that the purpose of the discriminatory classification was to prevent out-of-wedlock births. Nonetheless, the Court, as in *Levy*, concluded that there was no rational relation between the classification and its purported purpose, explaining as follows:

"Yet we see no possible rational basis for assuming that if the natural mother is allowed recovery for the wrongful death of her illegitimate child, the cause of illegitimacy will be served. It would, indeed, be farfetched to assume that women have illegitimate children so that they can be compensated in damages for their death. A law which creates an open season on illegitimates in the area of automobile accidents gives a windfall to tortfeasors. But it hardly has a causal connection with the 'sin,' which is, we are told, the historic reason for the creation of the disability."

*Id.* (citation omitted).

In *Gomez v. Perez*, 409 U.S. 535, 93 S.Ct. 872, 35 L.Ed.2d 56 (1973) (per curiam), the Court first considered the issue of how the heightened scrutiny applied under the Equal Protection Clause to classifications based on nonmarital child status impacts statutes governing the rights of children to receive support from their parents. In *Gomez*, the Court was con-

fronted with an equal protection challenge to the Texas statutory support scheme, which created a duty on the part of a father to support his marital children, but no such duty to support his nonmarital children. *Gomez,* 409 U.S. at 535, 93 S.Ct. at 873. The Court, in reliance on *Levy,* held that the Texas scheme violated the Equal Protection Clause by providing support benefits to marital children and denying them to nonmarital children. *Id.* at 538, 93 S.Ct. at 875. The Court explained that under its previous decisions, "a State may not invidiously discriminate against illegitimate children by denying them substantial benefits accorded children generally." *Id.* The Court did recognize that there were "lurking problems with respect to proof of paternity," but made clear that these problems are not constitutionally sufficient to justify a categorical denial of rights to support benefits to nonmarital children. *Id.*

In *Mills,* the Court addressed whether the Texas support scheme for nonmarital children established in response to *Gomez* survived equal protection scrutiny. *Mills,* 456 U.S. at 92, 102 S.Ct. at 1551. The Texas support scheme before the Court in *Gomez* entitled nonmarital children to support from their fathers, provided that the father's paternity had been established. *Id.* at 94, 102 S.Ct. at 1552. The Texas scheme required paternity to be established as a precondition to bringing a support action on behalf of a nonmarital child, and required proceedings to establish paternity to be initiated within one year of the birth of the child. *Id.*[5]

The *Mills* Court held that this one year statute of limitations on the initiation of paternity actions violated the Equal Protection Clause, because it invidiously discriminated against nonmarital children. *See id.* at 101, 102 S.Ct. at 1556. Picking

---

5. Prior to enacting this scheme, the Texas Legislature first responded to *Gomez* by creating a procedure whereby fathers of nonmarital children could voluntarily acknowledge paternity of a nonmarital child and thereby become obligated to support the child. *Mills,* 456 U.S. at 93, 102 S.Ct. at 1551–52. This scheme was held unconstitutional by the Texas courts, and the Texas Legislature responded by enacting the scheme before the Court in *Gomez. Id.* at 93–94, 102 S.Ct. at 1552.

up on its comment in *Gomez* about the problems of proof in paternity cases, the *Mills* Court recognized that the State had a legitimate interest in preventing the prosecution of stale or fraudulent claims that is purportedly served by statutes of limitation on paternity actions. The Court first noted that proof in paternity cases is "often sketchy and strongly contested, frequently turning upon conflicting testimony from only two witnesses." *Id.* at 97, 102 S.Ct. at 1554. Consequently, the Court concluded that "in support suits by illegitimate children more than in support suits by legitimate children, the State has an interest in preventing the prosecution of stale or fraudulent claims, and may impose greater restrictions on the former than it imposes on the latter." *Id.* at 98–99, 102 S.Ct. at 1554. The Court then articulated the standards that statutes of limitation on paternity actions must meet to satisfy the Equal Protection Clause as follows:

"Such restrictions will survive equal protection scrutiny to the extent they are substantially related to a legitimate state interest. *The State's interest in avoiding the litigation of stale or fraudulent claims will justify those periods of limitation that are sufficiently long to present a real threat of loss or diminution of evidence, or an increased vulnerability to fraudulent claims.*"

*Id.* at 99, 102 S.Ct. at 1554–55 (citations omitted) (emphasis added). The Court then elaborated on this standard, holding that a statute of limitations for paternity actions must meet "two related requirements" to withstand equal protection scrutiny. *Id.* at 99, 102 S.Ct. at 1555. First, the limitations period must be sufficiently long to "present a reasonable opportunity for those with an interest in [nonmarital] children to assert claims on their behalf." *Id.* Second, the time period in the limitations statute "must be substantially related to the State's interest in avoiding the litigation of stale or fraudulent claims." *Id.* at 99–100, 102 S. Ct at 1555.

Applying this equal protection test to the Texas one year statute of limitations, the Court held that it failed both prongs of the test. *Mills,* 456 U.S. at 100–01, 102 S.Ct. at 1555–56. The Court concluded that a one year limitations period did not

give mothers of nonmarital children sufficient time to assert support claims on behalf of their nonmarital children, as the financial, emotional, and social strains of giving birth to a child, and particularly out of wedlock, could prevent mothers of nonmarital children from initiating support claims on behalf of the children so soon after giving birth. *Id.* at 100, 102 S.Ct. at 1555. The Court further concluded that the one year limitations period was not substantially related to the State's interest in preventing stale or fraudulent claims, stating flatly that it could "conceive of no evidence essential to paternity suits that invariably will be lost in only one year, nor is it evident that the passage of 12 months will appreciably increase the likelihood of fraudulent claims." *Id.* at 101, 102 S.Ct. at 1555.

In a significant footnote, the Court discussed the appellant's argument that the paternity blood testing techniques available at the time adequately protected the State's interest in preventing stale or fraudulent claims. *See Mills*, 456 U.S. at 98–99 n. 4, 102 S.Ct. at 1554 n. 4. The Court, although recognizing that "blood tests are highly probative in proving paternity," rejected this argument. *Id.* The Court rejected this argument, stating that traditional blood testing techniques "do not prove paternity," but rather "[t]hey prove nonpaternity, excluding from the class of possible fathers a high percentage of the general male population." *Id.* at 98 n. 4, 102 S.Ct. at 1554 n. 4. Given that, in the Court's view, there was no testing technique that would prove to a sufficiently high degree of certainty that a man is the father of a child if in fact he fathered the child, the Court concluded that it was still necessary to "turn to more conventional forms of proof" of paternity. *Id.* Noting that the traditional forms of proof of paternity typically involve testimony of the parties and others, the Court concluded that "the State clearly has an interest in litigating claims while [this] evidence is relatively fresh." *Id.* The Court recognized, however, that new blood testing techniques aimed to "predict paternity with a high degree of probability," but it did not find that the existence of these techniques was sufficient to obviate the need for traditional

forms of proof of paternity, as the Court found that the scientific validity of these newer techniques was "still a matter of academic dispute." *Id.*

In a concurring opinion in *Mills,* Justice O'Connor, joined by four other Justices, indicated that statutory limitations periods longer than the Texas one year limit for initiating paternity actions may also violate the Equal Protection Clause. *See Mills,* 456 U.S. at 102–06, 102 S.Ct. at 1556–58 (O'Connor, J., concurring). Justice O'Connor pointed to two factors that tend to undermine the strength of the State's interest in preventing stale or fraudulent claims. *See id.* at 103–05, 102 S.Ct. at 1557–58. First, Justice O'Connor noted that, in addition to the State's interest in preventing stale or fraudulent claims, the State has a countervailing interest in "ensuring that genuine claims for child support are satisfied." *Id.* at 103, 102 S.Ct. at 1557. Second, following on the Court's discussion of scientific paternity testing techniques, Justice O'Connor maintained that "[t]he State's concern about stale and fraudulent claims is substantially alleviated by recent scientific developments in blood testing dramatically reducing the possibility that a defendant will be falsely accused of being the illegitimate child's father." *Id.* at 104 n. 2, 102 S.Ct. at 1557 n. 2.

Following *Mills,* the Court successively invalidated longer limitations periods for initiating paternity actions in *Pickett v. Brown,* 462 U.S. 1, 103 S.Ct. 2199, 76 L.Ed.2d 372 (1983), and *Clark v. Jeter,* 486 U.S. 456, 108 S.Ct. 1910, 100 L.Ed.2d 465 (1988). In *Pickett,* the Court held that a Tennessee two year statute of limitations on paternity actions violated the Equal Protection Clause. *Pickett,* 462 U.S. at 18, 103 S.Ct. at 2209. The Court applied the equal protection analytical framework laid down in *Mills,* and relied heavily on Justice O'Connor's concurrence in *Mills. See id.* at 12–18, 103 S.Ct. at 2206–09. The *Pickett* Court, holding that the first prong of the *Mills* test was not satisfied, endorsed the position Justice O'Connor took in her concurrence in *Mills* that "the emotional strain experienced by a mother and her desire to avoid family or community disapproval 'may continue years after the child is

born.' " *See id.* at 13, 103 S.Ct. at 2206 (quoting *Mills,* 456 U.S. at 105 n. 4, 102 S.Ct. at 1558 n. 4 (O'Connor, J., concurring)). The *Pickett* Court also concluded that the second prong of the *Mills* test was not satisfied, holding that a two year statute of limitations was not substantially related to the State's interest in preventing stale or fraudulent claims. *See id.* at 15, 103 S.Ct. at 2207. The *Pickett* Court endorsed Justice O'Connor's view set out in *Mills* that the State's interest in preventing stale or fraudulent claims "has become more attenuated" in light of the increasing accuracy of scientific techniques for determining paternity. *See id.* at 17, 103 S.Ct. at 2208 (quoting *Mills,* 456 U.S. at 104 n. 2, 102 S.Ct. at 1557 n. 2 (O'Connor, J., concurring)).

In *Clark,* the Court held that a Pennsylvania six year statute of limitations for initiating paternity actions violated the Equal Protection Clause. *Clark,* 486 U.S. at 463, 108 S.Ct. at 1915. Although the Court expressed doubt as to whether a six year period would be sufficiently long to give mothers of nonmarital children a reasonable opportunity to bring paternity actions, the Court based its holding expressly on its conclusion that the second prong of the *Mills* test was not satisfied. *Id.* at 463–64, 108 S.Ct. at 1915–16. The Court based this conclusion on three grounds. First, the Court noted that it was doubtful that Pennsylvania's interest in preventing stale or fraudulent claims required claims made after six years to be time-barred, inasmuch as Pennsylvania law permitted paternity actions after this period if the action is brought within two years after a support payment has been made. *Id.* at 464, 108 S.Ct. at 1916. Second, the Court found significance in the fact that the Pennsylvania Legislature had recently adopted an eighteen year statute of limitations for paternity actions. *Id.* at 465, 108 S.Ct. at 1916. The Court saw this statute as "a tacit concession that proof problems [in paternity actions] are not overwhelming." *Id.*

Third, and most significant for present purposes, the Court relied on the increasing accuracy of scientific tests for paternity even more explicitly than it did in *Mills* or *Pickett.* The Court first noted that the Pennsylvania Legislature had

adopted an eighteen year statute of limitations for paternity actions in response to Congress' enactment of the Child Support Enforcement Amendments of 1984, Pub.L. No 98–378, 98 Stat. 1305 (1984), requiring states to adopt procedures to establish the paternity of any child under eighteen years of age as a condition for participation in the federal child support program. *See Clark*, 486 U.S. at 465, 108 S.Ct. at 1916. The Court, examining the legislative history of the Child Support Enforcement Amendments, stated as follows:

> "The legislative history of the federal Child Support Enforcement Amendments explains why Congress thought such statutes of limitations are reasonable. Congress adverted to the problem of stale and fraudulent claims, but recognized that increasingly sophisticated tests for genetic markers permit the exclusion of over 99% of those who might be accused of paternity, regardless of the age of the child. H.R.Rep. No. 98–527, p. 38 (1983). *This scientific evidence is available throughout the child's minority, and it is an additional reason to doubt that Pennsylvania had a substantial reason for limiting the time within which paternity and support actions could be brought.*"

*Id.* (emphasis added).

Considering the constitutional history of paternity statutes of limitation, I conclude that § 5–1006(a) violates the Equal Protection Clause because it bars actions to establish the paternity of adult disabled children initiated after the child has turned eighteen. As we have seen, the Supreme Court in *Mills, Pickett,* and then *Clark* has invalidated paternity action statutes of limitation with successively longer limitations periods. Furthermore, in each case, the Court has relied more heavily on the accuracy of available scientific methods for proving paternity to reach its conclusion that the statutory limitations period at issue does not bear a substantial relation to the State's interest in preventing stale or fraudulent paternity and support claims.

Most significant, however, is the fact that DNA paternity testing techniques presently available permit paternity to be

established with near certainty. We have discussed the scientific underpinnings of DNA testing in several of our cases, and therefore I will not reiterate the discussion. *See, e.g., Armstead v. State,* 342 Md. 38, 49–54, 673 A.2d 221, 226–28 (1996). The application of DNA testing techniques to questions of paternity has for many years now permitted paternity to be affirmatively established to an exceedingly high level of certainty. *See* E. Donald Shapiro, et al., *The DNA Paternity Test: Legislating the Future Paternity Action,* 7 J.L. & Health 1, 29 (1993) (DNA technology permits paternity to be affirmatively established to a probability of 99.999999%). Given that present DNA paternity testing techniques permit paternity to be affirmatively established to such a high degree of certainty, I conclude that it is no longer possible to rely on the basis upon which the Court in *Mills* rejected the argument that the availability of scientific paternity testing techniques makes any statutory limitations period on paternity actions not substantially related to the State's interest in preventing stale or fraudulent claims. In *Mills,* the Court rejected this argument because it found that there was an asymmetry in the then-available paternity testing techniques: they could affirmatively establish nonpaternity, but could not affirmatively establish paternity. *See Mills,* 456 U.S. at 98 n. 4, 102 S.Ct. at 1554 n. 4. In the Supreme Court's view, it was this asymmetry that resulted in a continuing need for resort to traditional methods of proof of paternity, which in turn provides justification for the state to impose some statutory period of limitations on paternity actions. *See id.* This asymmetry, however, no longer exists as a result of the advent of DNA paternity testing techniques. Thus, in my view, the advent of these techniques calls into serious question the constitutionality of any statutory limitations period on paternity actions.

Appellee's arguments that § 5–1006(a) does not violate the Equal Protection Clause if it is interpreted to bar appellant's paternity action are unpersuasive. Appellee's first argument is that § 5–1006(a) does not implicate the Equal Protection Clause at all, because it does not discriminate against nonmar-

ital children in favor of marital children, but rather only discriminates against nonmarital children who file untimely paternity suits in favor of nonmarital children who file timely suits. This argument plainly proves too much. Assuming that appellant's claim is correct, the same could be said of the limitations periods the Court invalidated on equal protection grounds in *Mills, Pickett,* and *Clark.*

Appellee's second argument is that § 5–1006(a) survives equal protection scrutiny because it is substantially related to the legitimate state interest in providing repose to defendants. Again, appellee's argument is belied by *Mills* and its progeny. In *Mills,* the Court established a two-prong test for determining whether statutes of limitation on paternity actions survive equal protection scrutiny: a limitations period for the initiation of paternity actions is consistent with the Equal Protection Clause if and only if the limitations period is both (1) sufficiently long to permit persons with an interest in the child to initiate paternity actions, and (2) substantially related to the State's legitimate interest in preventing stale or fraudulent claims. *See Mills,* 456 U.S. at 99–100, 102 S.Ct. at 1555. The Court applied this test without alteration in *Pickett* and *Clark. See Clark* 486 U.S. at 461–62, 108 S.Ct. at 1914 (applying *Mills* test, and noting that the Court "has developed a particular framework for evaluating equal protection challenges to statutes of limitations that apply to suits to establish paternity"); *Pickett,* 462 U.S. at 12–13, 103 S.Ct. at 2206–07. This test does not recognize a state interest in providing repose to defendants as being relevant to the constitutional analysis of an equal protection challenge to a statute of limitations for paternity actions. Consequently, there are no grounds provided by existing Supreme Court precedent to believe that the State's putative interest in providing repose to potential defendants in paternity actions could be sufficient to insulate a paternity statute of limitations from an equal protection challenge if the limitations period in the statute is not substantially related to the State's interest in preventing litigation of stale or fraudulent claims.

## II.

The majority, although aware of the Supreme Court's holdings in *Gomez, Mills,* and *Pickett,* fails to address appellant's equal protection argument. *See* maj. op. at 339–42, 901 A.2d at 832–34 (discussing these cases only in the context of discussing the legislative history of § 5–1006). Leaving aside that the majority's refusal to consider appellant's constitutional argument violates appellant's right under the Maryland Rules to have this argument addressed,[6] the majority's abject refusal to even consider this argument is particularly troublesome given that appellant has presented a persuasive argument that applying § 5–1006(a) to bar her paternity action violates the Equal Protection Clause.

To the extent that the majority's opinion permits any surmise as to its objections to the equal protection argument, the majority's objections are unpersuasive. The majority seems to endorse the position that appellant should be barred from pursuing her paternity action because to permit her to do so would unduly infringe on appellee's interests in repose, stating as follows:

> "As applied to Ms. Trembow, who, at any time from the moment she knew she was pregnant with Ivan until the child turned eighteen, could have filed a paternity action against Schonfeld, the statute is clear,' valid, and enforceable. . . . There is no justifiable basis for torturing FL § 5–1006 to create an ambiguity that does not exist and then read the statute to mean what it plainly does not say and

---

6. This case is before us on a writ of certiorari, issued on our own initiative prior to decision by the Court of Special Appeals; as such, we must "consider those issues that would have been cognizable by the Court of Special Appeals." Md. Rule 8–131(b)(2). Appellant's equal protection argument was plainly raised in her opening brief; consequently, she has not waived this argument on appeal, and is entitled to have the Court address it given that it rejected her statutory construction argument. *See Simmons v. State,* 392 Md. 279, 292 n. 1, 896 A.2d 1023, 1031 n. 1 (2006) (observing that if an issue is raised and argued in appellant's opening brief, it is adequately raised on appeal in the Court of Special Appeals).

was never intended to say, in order to reward Ms. Trembow for sleeping on her rights for more than eighteen years." Maj. op. at 345–46, 901 A.2d at 836. As discussed at length *supra,* this objection is without merit because the Supreme Court has made it abundantly clear that a putative father's interest in repose is not an interest that is sufficiently strong to give constitutional justification to invidious discrimination on the basis of nonmarital child status.

The emphasis the majority places on the legislative history of the Child Support Amendments suggests that perhaps the majority believes that the equal protection argument is somehow undermined by this legislative history. *See* maj. op. at 341–42, 901 A.2d at 834–35. According to the majority, this history shows that Congress was aware at the time of their enactment in 1984 that paternity testing techniques permitted paternity to be affirmatively established to a probability of greater than ninety-nine percent. *See id.*

If indeed this is the majority's argument, it is quite curious, as it runs counter to what is perhaps the most fundamental principle of American constitutional jurisprudence, the doctrine of judicial review. This well-known doctrine, first enunciated by Chief Justice Marshall in *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803), states as follows:

"It is emphatically the province and duty of the judicial department to say what the law is. Those who apply the rule to particular cases, must of necessity expound and interpret that rule. If two laws conflict with each other, the courts must decide on the operation of each. So if a law be in opposition to the constitution; if both the law and the constitution apply to a particular case, so that the court must either decide that case conformably to the law, disregarding the constitution; or conformably to the constitution, disregarding the law; the court must determine which of these conflicting rules governs the case. This is of the very essence of judicial duty.

"If then the courts are to regard the constitution; and the constitution is superior to any ordinary act of the legisla-

ture; the constitution, and not such ordinary act, must govern the case to which they both apply."

*Id.* at 177–78. To give weight to the opinion of Congress as to the constitutionality of an eighteen-year statute of limitations for paternity actions, as the majority suggests that we do, would run afoul of the doctrine of judicial review, and would amount to the effective abdication of what *Marbury* identified as "the very essence of judicial duty," the duty of the judiciary to independently decide constitutional issues.

For the foregoing reasons, I would hold that applying § 5–1006(a) to bar appellant's action to establish the paternity of her adult disabled child would violate the Equal Protection Clause of the United States Constitution by impermissibly discriminating on the basis of nonmarital child status. Accordingly, I would reverse the judgment of the Circuit Court for Frederick County, and remand the case to that Court for further proceedings.